# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# BOWLING GREEN DIVISION
# CASE NO. 1:08-CV-00156-R

**HAROLD T. SHINES**                                                                             **PLAINTIFF**

v.

**ENVIRONMENTAL AND PUBLIC PROTECTION CABINET/**
**DEPARTMENT OF FINANCIAL INSTITUTIONS**                **DEFENDANT**

## MEMORANDUM OPINION

This matter comes before the Court upon Defendant's Motion to Dismiss and Motion for Summary Judgment (DN 30). Plaintiff has responded (DN 31), and Defendant has replied (DN 33). This matter is now ripe for adjudication. For the reasons that follow, Defendant's Motion is GRANTED.

## BACKGROUND

Plaintiff Harold T. Shines was hired on December 1, 2005, as a Financial Institutions Examiner III at the Compliance Branch of the Department of Financial Institutions ("DFI").[1] DFI "charters, regulates, and supervises financial institutions in Kentucky, including banks, trust companies, savings and loan associations, and credit unions." *Members Choice Credit Union v. Home Fed. Sav. & Loan Ass'n*, No. 2008-SC-000877-DG, 2010 WL 2016846, at *1 (Ky. 2010). Plaintiff was given orientation and initial training in the main office of DFI in December 2005, as well as on-the-job training with other experienced examiners. The on-the-job training provided Shines with the opportunity to observe experienced examiners conduct examinations and allowed him to assist those examiners in preparing for examinations, performing the

---

[1] During the time Shines was employed at DFI, it was known as the Office of Financial Institutions and was a part of the Environmental and Public Protection Cabinet ("EPPC"). The EPPC was reorganized in 2008 and DFI is now a part of the Public Protection Cabinet ("PPC").

examinations and preparing the required documentation from the examinations.

From May 30 to June 1, 2006, Plaintiff received additional training after DFI employees complained about Plaintiff's performance. During that training, Carmen Bishop, the supervisor of the Compliance Branch, Division of Securities at DFI, interviewed Plaintiff about his working knowledge regarding examinations. She determined that he did not know or understand basic terms, even though he had been working on examinations for over five months. She directed him to review continuing education disks relevant to his job, but reportedly heard him snoring during the time he was supposed to be reviewing the disks. During April, May, June and July 2006 other experienced examiners assisted in training Plaintiff by having him complete examination modules, then comparing his responses to their own. Bishop also provided feedback to Plaintiff on how to improve his performance and referred him to the examination manual.

On August 9, 2007, Bishop placed Plaintiff on a Performance Improvement Plan ("PIP") after she determined he was not performing at the level of even a Financial Institutions Examiner I. She prepared and sent additional training materials to him and assigned him to review continuing education discs for the week of August 21, 2006. Bishop then asked Plaintiff to be an examiner in charge ("EIC") of a basic broker-dealer examination, which she observed. She found that the module submitted by Plaintiff for that examination demonstrated a lack of understanding of broker-dealer concepts, examination procedures and showed that he could not serve as EIC of a basic broker-dealer examination.

On January 4, 2007, Bishop conducted an in-person training with Plaintiff and another examiner. Bishop determined that although Plaintiff had made some improvement, it was

limited and his performance was not at the level required by his PIP or that was necessary to make him a productive member of the examination team.  Also in January 2007, Plaintiff was asked to be the EIC for an examination of an investment advisor.  Bishop again determined that he lacked a basic understanding of investment advisor operations and was not capable of serving as an EIC for investment advisors.

On April 4, 2007, Plaintiff was suspended for ten business days.  A few days later, he sent a note to Bishop and Division Director Colleen Keefe which stated that he "will need to be off from work until the 30th of April.  This is due to the stress and hardship of the suspension I under (sic) and my uncertain future with the Dept."  Plaintiff submitted additional medical excuses that extended his absence through May 24, 2007.

On June 1, 2007, Plaintiff faxed Defendant notification of an injury he had sustained on August 8, 2006.  Plaintiff states he notified his work supervisors at the time of the accident and was not aware that they had not informed Bishop.  In the fax, Plaintiff stated he had sustained a lower back injury in a car accident and would like to file a workers' compensation claim for the injury.  Plaintiff also requested Defendant purchase an orthopedic chair for him.

After he returned to work, Plaintiff did not perform any examinations that were located more than forty miles travel distance from Bowling Green, Kentucky.  As an examiner, Plaintiff was required to travel long distances and stay at sites for several days to perform the examinations before returning to his home in Franklin, Kentucky.  On July 12, 2007, Plaintiff provided Defendant with a medical note that restricted him from lifting over twenty pounds or traveling to locations other than Bowling Green.

On July 20, 2007, Defendant sent Plaintiff a letter requesting that he provide specific

modifications or adjustments he felt Defendant could make that would enable him to perform the essential functions of his job. Defendant sent Plaintiff another letter on July 23, 2007, placing him on agency-directed sick leave. The letter stated that Plaintiff would remain on sick leave until he provided a statement from his medical provider certifying his "fitness to return to work and perform all of the essential duties of [his] position, including driving and traveling." Plaintiff responded on July 24, 2007, requesting a change of jobs.

Plaintiff remained on agency-directed sick leave until September 27, 2007, when Defendant placed him on Family Medical Leave. He remained on Family Medical Leave through January 31, 2008, when he was placed on P-1 sick leave. P-1 sick leave is an unpaid sick leave status for Kentucky state government employees. An employee is considered to have resigned from employment if he does not provide medical certification of fitness to return to work within one year of being placed on P-1 leave. Plaintiff did not provide a fitness for duty statement; Defendant considered him to have resigned as of January 31, 2009.

Plaintiff filed a Complaint with this Court on October 28, 2008. He alleges that Defendant violated Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq*. Defendant now moves to dismiss Plaintiff's ADA claim and moves for summary judgment with regards to Plaintiff's Title VII claims.

## STANDARDS

Federal Rule of Civil Procedure 12(b)(1) provides that a party may file a motion asserting "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "Subject matter jurisdiction is always a threshold determination," *Am. Telecom Co. v. Leb.*, 501 F.3d 534, 537 (6th Cir. 2007)

(citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)), and "may be raised at any stage in the proceedings," *Schultz v. Gen. R.V. Ctr.*, 512 F.3d 754, 756 (6th Cir. 2008). "A Rule 12(b)(1) motion can either attack the claim of jurisdiction on its face, in which case all allegations of the plaintiff must be considered as true, or it can attack the factual basis for jurisdiction, in which case the trial court must weigh the evidence and the plaintiff bears the burden of proving that jurisdiction exists." *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). "A facial attack on the subject-matter jurisdiction alleged in the complaint questions merely the sufficiency of the pleading." *Gentek Bldg. Prods., Inc. v. Steel Peel Litig.*, 491 F.3d 320, 330 (6th Cir. 2007). "If the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); *see also Bauer v. RBX Indus. Inc.*, 368 F.3d 569 (6th Cir. 2004).

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which

the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## ANALYSIS

**I. ADA Claim**

"[S]tates are immune to suits for money damages under Title I of the ADA." *Robinson v. Univ. of Akron Sch. of Law*, 307 F.3d 409, 411 (6th Cir. 2002) (citing *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001)). In his Complaint, Shines does not request injunctive relief; he is only seeking money damages.[2]

"[T]he entity asserting Eleventh Amendment immunity has the burden to show that it is entitled to immunity, *i.e.*, that it is an arm of the state." *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 963 (6th Cir. 2002). To determine whether an entity is "an arm of the state" courts traditionally examine four factors: "(1) whether the state would be responsible for a judgment against the entity in question; (2) how state law defines the entity; (3) what degree of control the state maintains over the entity; and (4) the source of the entity's funding." *S.J. v. Hamilton Co., Ohio*, 374 F.3d 416, 420 (6th Cir. 2004).

Here, DFI was created by Kentucky statute and mandated with the exercise of "all

---

[2] On June 10, Plaintiff moved to amend his Complaint. The Court denied these motions as a result of undue delay.

administrative functions of the state in relation to the regulation, supervision, chartering and licensing of banks, trust companies, savings and loan associations, consumer loan companies, investment and industrial loan companies, and credit unions, and in relation to the regulation of securities." KRS § 286.1-011. Carmen Bishop has also submitted an affidavit stating that DFI is a state agency. Additionally, Plaintiff's EEOC Charge of Discrimination is addressed to the Commonwealth of Kentucky and he admits in his response brief that DFI is a state agency.

The Court finds that this evidence is sufficient to show that DFI is an arm of the state. Because Kentucky has not consented to suit in this case,[3] the Court holds that Plaintiff's ADA claim against DFI must be dismissed. *See J.P. Silverton Indus. Ltd. v. Sohn*, No. 1:04-CV-128-R, 2005 WL 3556036, at *2 (Dec. 28, 2005) (holding that the Court had no jurisdiction over the Office of Financial Institutions).

**II. Title VII Claims**

Plaintiff makes two types of race-related claims under Title VII: first, that he was subjected to racial harassment, and second, that he was denied equal training due to his race. To prove that Defendant discriminated against him, Plaintiff must first establish a prima facie case of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If Plaintiff succeeds in stating a prima facie case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *See, e.g.*, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir.2008). If Defendant does so, then the burden shifts back to Plaintiff to show

---

[3] Defendant did not list sovereign immunity among its affirmative defenses in its Answer, but raising the defense for the first time in the present Motion does not constitute waiver. *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 n.4 (6th Cir. 2008).

that Defendant's proffered reason was merely pretext for discrimination. *See, e.g., id.* There is no dispute that Plaintiff, as an African-American, is a member of a protected class.

### A. Hostile Work Environment Claim

Plaintiff alleges that he was the subject of racial harassment inflicted upon him by his supervisor and DFI's management, including Carmen Bishop. A plaintiff may establish a prima facie hostile work environment claim by showing that (1) the plaintiff "is a member of a protected class;" (2) the plaintiff "was subjected to unwelcomed racial harassment;" (3) "the harassment was race based;" (4) "the harassment unreasonably interfered with [the plaintiff's] work performance by creating an environment that was intimidating, hostile, or offensive;" and (5) "employer liability." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007) (citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)).

Plaintiff complains about one specific incident in August 2006 when Carmen Bishop asked him to sit in the back of the room at a meeting, as well the period of time from August 2006 until January 2008 when he alleges that "he was constantly harassed to take a demotion or be terminated." Defendant does not deny that Plaintiff was asked to sit in the back of the room at the meeting. As it explains, the incident occurred during a town hall meeting where investment advisors were invited to hear presentations by Bishop's staff. Bishop and the other presenters sat at the front of the room, along the side wall. Defendant states that because Plaintiff was a new examiner and was not a presenter, Bishop asked him to sit in the back of the room.

In support of his contention that he was harassed into taking a demotion, Plaintiff cites three items of correspondence sent by Defendant. The first, an email sent on November 30,

2006, by Colleen Keefe, Director of the Division of Securities at DFI to herself, stated that Plaintiff did "not wish to do a voluntary demotion" because Defendant knew he had no securities exam experience when he was hired. Keefe recorded that she told him that based on his prior experience, DFI thought he would be able to do basic securities exams by that point, but that he has not been able to do so. The second, an email sent on January 9, 2007, by Keefe to Plaintiff regarded Plaintiff's performance and restated the option of a voluntary demotion. The email states as follows:

> Harold,
>
> Attached are the job duties for the Examiner 2 and also those for the Examiner 3 that Carmen gave you during your 2007 performance planning meeting with her last week. I wanted you to see the difference in the expectations between the two.
>
> As you can see from the attached, an Examiner 3 is expected to serve as EIC on both routine (basic) and complex case exams whereas an Examiner 2 is only expected to do so on routine exams. You are now serving as EIC on routine exams and making some progress in your ability to do so independently. This is good. Only you can decide whether you feel you will be able to make enough progress to be able to start serving as EIC on complex exams.
>
> If you don't feel that you can make progress in this area such that by the end of this year you are serving as EIC on complex exam with "little or no supervision" (indicated in the Examiner 3 job duties), then the option still remains for you to drop to the Examiner 2 classification. I really hope you don't see this as a negative. Coming to the Kentucky OFI was obviously a big change and it's only logical that some adjustments need to be made as you learn about us and we learn about you.
>
> Colleen

The final piece of correspondence cited by Plaintiff as evidence of harassment is an April 3, 2007, letter sent by Defendant advising Plaintiff that he was being suspended for ten days due to his unsatisfactory performance.

9

The Court finds that Plaintiff has not satisfied several factors of his prima facie hostile work environment claim. First, even if the above actions could be considered harassment, Plaintiff has not shown that they were based on his race. While "[c]onduct that is not explicitly race-based may be illegally race-based and properly considered in a hostile-work-environment analysis when it can be shown that but for the employee's race, [the employee] would not have been the object of harassment," *Clay*, 501 F.3d at 706, Plaintiff has not provided sufficient evidence that but for his race he would not have been the object of harassment. The only piece of evidence that could be construed as supporting a causal nexus between Plaintiff's race and his harassment is that the other employees at the August 2006 meeting were not asked to sit in the back of the room. This isolated incident cannot support a hostile work environment claim. *See Hafford*, 183 F.3d at 512 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Even if it could, Defendant has articulated a legitimate, nondiscriminatory reason for directing Plaintiff to sit at the back of the room– he was not a presenter– that Plaintiff has not shown to be mere pretext for discrimination. Also, even assuming that other employees were not offered a voluntary demotion, Defendant has articulated a legitimate, nondiscriminatory reason for doing so– Plaintiff's performance was unsatisfactory– that Plaintiff has not shown to be mere pretext for discrimination.

Second, Plaintiff has not shown that the alleged harassment unreasonably interfered with his work performance. To satisfy this prong of the prima facie case, "the plaintiff must present evidence showing that under the totality of the circumstances the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Clay*, 501 F.3d at 707 (internal quotations and citations omitted). The

work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787. A court must examine all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

A reasonable person could not find the conduct of Defendant hostile or abusive. Defendant has offered a reasonable explanation for the isolated incident when Plaintiff was asked to sit in the back of the room. Additionally, offering Plaintiff the opportunity to take a voluntary demotion, and the manner in which Defendant did so, cannot be characterized as harassment. Plaintiff was not meeting the performance expectations of Defendant. The demotion would have allowed Plaintiff to meet lower expectations and perhaps avoid the suspension that occurred. The January 2007 email is gentle, non-threatening, positive and informative.

In sum, Defendant is entitled to summary judgment with regards to Plaintiff's hostile work environment claim.

### B. Discriminatory Training Claim

In his Complaint, Plaintiff also alleges that "my training was racially biased, no one working with me directly as others hired had someone in their office to work with them." Title VII provides that "[i]t shall be an unlawful employment practice for any employer . . . controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race in admission to, or employment in, any

11

program established to provide apprenticeship or other training." 42 U.S.C. § 2000e-2(d). A plaintiff may establish a prima facie case of discriminatory denial of training by showing that "(1) the plaintiff is a member of a protected class; (2) the defendant provided training to its employees; (3) the plaintiff was eligible for the training; and (4) the plaintiff was not provided training under circumstances giving rise to an inference of discrimination." *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 650 (4th Cir. 2002). More generally, a plaintiff may establish a prima facie case of race discrimination by proving that he (1) is a member of a protected class, (2) was qualified for his job, (3) suffered an adverse employment action, and (4) was treated differently than similarly situated non-protected employees. *See, e.g.*, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008).

Plaintiff has not proven his prima facie case of discrimination. Most importantly, there is no evidence that he was denied any training. Defendant has outlined the initial training Plaintiff received in December 2005, the on-the-job training he received after that, and the additional training he received in May, June and August 2006 and January 2007. Plaintiff does not address his training claim in his response. He has not provided the Court with any facts or argument beyond the one sentence in his Complaint to support his discriminatory training claim. Moreover, there is no evidence that he suffered an adverse employment action related to his training or was treated differently than similarly situated non-protected employees. "An adverse employment action is an action by the employer that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *White*, 533 F.3d at 402 (quoting *Burlington Industries v. Ellerth*, 524 U.S. 742, 761 (1998)). Providing

unequal training opportunities alone does not constitute an adverse employment action.  *See Porter v. Nat'l Con-Serv, Inc.*, 51 F. Supp. 2d 656, 658 (D. Md. 1998).  Plaintiff does not allege that his lack of training opportunities had an impact on his wages, or that it contributed to Defendant placing him on suspension or sick leave.  *Compare Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 710 (6th Cir. 2007) (holding deprivation of increased compensation as the result of a failure to train constitutes an adverse employment action).

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss and Motion for Summary Judgment (DN 30) is GRANTED.